Thank you. Good morning, your honors. You may be seated in court. My name is Miguel Neri with the California Department of Justice, and I'm representing the California Department of Corrections, and you'll be able to taste it. I have six minutes today. I'd like to reserve one minute for rebuttal. Your honors, I'm going to be addressing two elements of the district court's liability ruling that demonstrate that the judgment must be reversed. In this case, the judgment entered instead for the appellants. That's two elements of disparate impact and business necessity. With regard to disparate impact, the district court appeared as a matter of law because it failed to properly analyze whether Question 75 affected applicants due to race or ethnicity, in this case being Latino, as opposed to having been formerly undocumented aliens. So we contend that there are two different independent causal agents working here, and that by focusing solely on the bottom line nine, and simply determining whether this opposition of Latinos was statistically significant, the court abdicated its duty to determine whether Question 75 impacts Latinos as Latinos. Statistical significance is a mathematical term that merely addresses randomness or the lack thereof. It does not determine causation. To do that, you need to look at the statistics. All 10,357 Latinos were asked Question 75. 99.7% of them answered no. So we know that being Latino, it does not correlate with using a false Social Security number. On the other hand, eight of the nine in the bottom line impacted group of nine were former undocumented aliens. And I think it's important for the court to recognize that Native Latinos and Native non-Latinos, when they do use false Social Security numbers, are using them in significantly different ways from the way former undocumented aliens use them. Someone is a former, or someone is an undocumented alien, they are trying to consistently use a number to create an identity. And that's very different. What you see, for example, in the bottom line nine, which only needed a person, FJ, was basically using it for tax fraud. And aside from that, if you look at the other applicants, what you see are people who show up for a job, don't have their card, they make up a number, or they have the wrong number. But in this case, the people who end up in the bottom line are more inclined to use it in ways that are consistent and persistent. If I could turn it into my 15 minutes of business and assess any of the top words that I should point out. Sorry, I just really missed that. I didn't mean to put your last point. So, I guess my question is, if the undocumented Latinos who use a fake and invented Social Security number to get a job, do you think that they're in a worse position than a native Latino who uses an invented Social Security number to commit tax fraud or identity theft? No, Your Honor, and that's why FJ was withheld, because he did use it for tax fraud. But what I'm saying is it's used in different ways, and I should point it out that they're So, that's part I didn't get about your argument. It seems to me that if you're a native and a citizen by birthright and citizenship, that you could easily be assigned a Social Security number. So if you were going to invent one, it would be for nefarious purposes. Well, I don't think that, but if you look at the actual application, there are numerous cases where people just used them one time for apparently no criminal reason and went to an only-surmiser. Why do we make the same assumption about undocumented homeless aliens? Well, for the same reason that I think, and you can, often people do, and that's why 11 of the 14 people who were cleared were former undocumented aliens by the CGCR. CGCR is looking at it on a case-by-case basis, and in some cases, the use isn't extreme. In other cases, it may be, and it just depends on the individual. Well, it doesn't appear here that the CGCR did look at an individualized determination, contrary to the EEOC guidelines. It appears here that the EEOC simply assumed an identity theft. Well, in this case, Your Honor, I think it's important to start with what the court said in the ER at page 5, line 5. The district court said that it was not a given that Mr. Guerrero would have passed had the CGCR used the type of system that the court wanted the CGCR to use. And that's an interesting and remarkable statement by the district court, but I think it reflects the fact that the court observed Mr. Guerrero's testimony, saw that there was evidence he used it for more than just work, and saw that there was evidence that he used it even after he got his valid social security number. So, looking at these cases are sometimes close cases, and there's going to be imperfection. There's no doubt about it. This is not something where one can guarantee perfection, and there could be easy cases. There could be hard cases. As the court noted, this was not a slam dunk, and it could have gone the other way. So, faithfully, with regard to business necessity, Your Honor, the trial court's findings in this case show not only that the policies are in line with the EEOC's standards, which the court actually said that they were in line with, the court also found that the CGCR's conduct was complied with. The law had found that the CGCR did not compete with both the applicants and asked for supplemental information, and the court adopted the statistics which show that when CGCR exercises its discretion, it does so in a way that actually favors Latinos. At this point, Your Honor, the court rejected any claim of intentional discrimination, rejected the due process argument of Plaintiff. Plaintiff had his day in court before the incame of federal administrative tribunal on immigration discrimination and laws. For this court, at this point, to find liability, it would have to contend with the fact that the trial court found a rational basis for Question 75, that there's no discriminatory intent moved from process violation. The court said expressly that Question 75 is not an illegal practice and that we could continue to use Question 75. There is no basis for a faulty liability here. There's no basis for remand. In this case, there was a complete failure of proof on alternative remedies, and Plaintiff never established that any alternative would have less of an impact than the existing system. Remember, 10,257 Latinos, and between 4 and 9 were negatively impacted. That amounts to an excess number of Latinos between 2 and 5, or a handful billion out of 10,257 Latinos. There's no basis here before liability, Your Honor. We ask that the court enter, reverse the judgment, and enter judgment for CGCR and State Personnel. Thank you. Thank you. Good morning. This is the court. Tarquin Preciosi on behalf of California Police Chiefs Association and California State Sheriff's Association. The district court's holding has very troubling repercussions in the ability of law enforcement agencies across the state or the municipal police chiefs, sheriffs, or CGCR to select and retain the most qualified candidates. By implication, the district court's holding really impacts the individualized assessment within California law mandates within all agencies, mostly the boutique. All agencies follow a very similar pattern of selection practice as CGCR did here. There's a host of background questions, 100 in CGCR's case, more or less, for other agencies. This is one question out of 100, which is not necessarily a showstopper. But at this question, all agencies will examine the response to this question. It's not one of my qualifications. I'll go back. I'm going to ask the applicant for an explanation. As the assistant to class action, this just pertains to Mr. Guerrero. I understood. Right. But for class action, I think your concerns would be magnified. Well, the practical implications for law enforcement is that if this was found to be a valid question, the district courts, as you keep using it, disagree ultimately with the use and the impact in this particular case for one person. Well, I think that is stuck on the floor, Your Honor, because this is illegal conduct. And legal conduct, while district courts are a minor negative, do not find it can ever be a minor negative. For a peace officer, there is no more profession in our society that is elevated to such a level of trust. But if you apply to your client, the police chiefs, and you answer yes, is everybody automatically without? No, absolutely not, because when a visualized assessment is done, as was in this case. No, it actually wasn't done in this case, at least unless the district court's study was clear enough. Well, the district court, as to different applicants, whether or not, I won't quote what I've said in this particular Mr. Cabrera's case. I guess you were talking about. They're understood that in each case, the background investigator reviews the answers to questions. If there is a yes or no, depending on what the question is, the background investigator will go back and give the applicant an opportunity to explain yes or no answers. Your position somewhat contradicts your usage. This was illegal conduct by the claimant for using the false social security number. Illegal conduct must be disqualified usage for position in law enforcement. Illegal conduct can be a disqualified use, and it must be. So how do you reconcile that with your claimant? In this visualized assessment, after the person answers yes, isn't the simple use of a false social security number illegal conduct? The use of a false social security number is illegal conduct. So how can there be an individual assessment on your view? Because that is what each agency will do. I mean, for example. But you said illegal conduct must be a disqualifier. Illegal conduct should be a disqualifier. Yes, it must be a disqualifier, but isn't necessarily a disqualifier. Well, it should and must. So if you ever allow someone to answer yes to position in law enforcement, there may be mitigating circumstances. In assuming hypothetically that you didn't do an individualized assessment, then that could give rise to a liability for that person. You say we're going to do an individualized assessment for everybody except this person. That's a different issue. Well, it depends on the nature of the way the application is filled out. For example, in closed applications, there will be a place to explain a yes or no answer depending on the question. And if the application itself could lead to a disqualification or the background investigator could say, no, I need you to go back, I need you to look at this and discuss this further with the applicant. So it really is done on an individual basis. Thank you, Counsel. Thank you. Good morning, Your Honor. My name is Alvin Kittis. I'm here representing the State Personnel Board. Let me start by saying we should not be here. We're not a proper defendant in this Title VII action. This PB is not an out-employer by definition of the statute, nor are there any other theories in that matter. What is our role? What's the premise in which we were brought into this action? The third-party interference theory was alleged by plaintiffs. That wasn't really addressed in the district court's decision, but that's the only theory in which we were brought in for a Title VII claim. What is our role? Before we examine third-party interference, what did we do here? We accepted an appeal filed by Miskeen Herrero from CDCER's decision to withhold him from the employment process. Third-party interference suggests that we interfere with an employment relationship. By the time that appeal arrived to us, there was no relationship between CDCER and Miskeen Herrero. That's been severed by CDCER. We're not interfering with anything about that. Right, but his appeal to you mentioned that he was discriminated against. That's part of the employment process. Understood, Your Honor. The appeal, this is where I would read the appeal when I would say the appeal really challenged CDCER's determination whether or not Miskeen Herrero was suitable to become a peace officer. The appeal did not conspirally address the justice and discriminatory process in which he had undergone. This is one that both speak on, and I think Judge Olson will a little bit observe, is this subtle prejudice and discrimination that is passing quite a bit of an administrative body in handling an appeal that consists of suitability to decipher that we're talking about discrimination. Did the board just adopt the same rationale as the CDRC? Your Honor, this is not a rubber-stamping endeavor, and that's what you're asking. Well, I'm saying in this case that the board did. The board had to look at the reasons put forth by CDCER for determining whether or not Miskeen Herrero was not suitable. In this regard, the board did make its own assessments and determined, you know, as a law enforcement agency, we can see why prolonged use of things such as a security number that did not belong to an individual man rendered him unsuitable. Indeed, as a matter of fact, I think this was remanded to get some further clarification before it was remanded to the hearing officer. This is a close relation where, as the board fits in this, what it did in this case, and it also has much broader constitutional responsibilities for overseeing this whole compliance system, right? I think that's a very broad question to say that we are. What is your constitutional mandate? To ensure that our principle is enforcing the state's social service. Now, with that being said, what tools are available to the SBB? Just like any administrative body, there are multiple hats we wear. In this instance, we wore the adjudicatory hat, one where we entertain an appeal, determine what the evidence and information presented to us were or are at the time, and make the best determination you can. Now, if your honor is leading down the road to St. Louis, should you determine this? Not just me. I really want to understand the role of this agency. Absolutely, and in this particular aspect, it's an adjudicatory in nature. We accept an appeal. We are impartial in that regard. Unlike other situations, this is even a situation where the appeal was the consistent pattern, challenging question 75, and it's an application of how the assessment is made. Your honor, in the five years of this, this is the only appeal the SBB saw. That is really asked a lot. For an administrative body to decide from this one appeal, aha, we got a disparate impact case and we are the employer. No. Third-party interference theory is quite clear. The third party must have peculiar control over the process. The third party itself must have done it, so the adjudicatory hat. No, not here. We decided the case. And where the adjudicatory hat is important, as the court well knows, any time you adjudicate a matter, you bring the barrier of impartiality. You leave your self-interest behind as a court. You leave your concerns about personal accountability or facing liability outside because that shouldn't happen. This is what's happening now. Where a defendant is when you try to settle a lawsuit is facing real monetary liability. That's an adjudicatory hat. So assume that a more adjudicatory case has been held, in this case, the bank employee in Salem. Who pays for that? Where does the money come from? Does that come from the guilt or the state's treasury? I mean, is it all? Are you seeing different budget allocations? There are different budget allocations. It's still Glen Pond, right? Well, that would blur the lines between difference of responsibility and where the money is coming from. And it would change how we would have to rule on these cases. Just because it's all coming from Glen Pond, we're still not lucky to engage in conduct that would invite lawsuits. And this is why I'm saying we can just go to legislation and ask for more money. It's not an answer at all. It's important to differentiate SBB and CDCR, and it's an independent role here, and that is vitally important. We didn't create Question 75. We didn't establish any of those things. We just heard the appeal. We made the decision to sustain CDCR, the Avenue of Recourse of Investigatory Elders, which is how it's our decision. It's by way of a writ. And I suspect that earlier in the arguments, the data was similar in that nature. Was the decision justified and was there substantial evidence in support of that? In that sense, SBB, as an adjudicatory body, would ask this Court to say, you're not a proper defendant. Third-party interference theory does not apply to you in this instance. I know it's the only one that applies to you. Thank you. Thank you, Susan. Thank you. We'll go for Mr. Hanna's full three minutes. Thank you. May it please the Court, Mr. Senator, to do which I will commence on their behalf. Thank you, Your Honor. May it please the Court, Mr. Hanna, on behalf of CDCR. The District Court's order fees and costs of $1.4 million in this case is way too much in a single plaintiff's action. There's a shocking disproportion between the quality and quantity of relief that plaintiffs obtained after trial in comparison to what he sought. He lost nine out of the ten claims reaching a flood in his complaint, and he only obtained limited personal equitable relief in comparison to the systemic relief that he requested from the District Court. While there's no precise goal for a partial success reduction, the District Court still must adequately explain the reasons for its reduction of the Lodestar, which the District Court failed to do here. It failed to articulate a reason as to why a 15% reduction was adequate when, in fact, the District Court might in certain cases range much higher from 40% to 50%, and those were percentages of the District Court which it distinguished and chose a couple of out-of-circuit cases to calibrate in support of 15% in this case. The District Court still failed to articulate the reason why Plaintiff Guerrero was less successful than the other two cases cited. The recommended reduction is just simply too low in this case where only one plaintiff... So what did you argue below in terms of the appropriate reduction? Well, the appropriate reduction, we said, would be more in line with other cases in the 9th Circuit, including the Harris case and the Navarro case, which was listed in the briefs, ranging in 40% to 50%. Okay. Thank you. Thank you. Thank you. Good morning, Your Honors, and please support. My name is Chris DeFranco. I represent the community here in the District Court of Guerrero. With me at the council table are Richard Charles, who will be arguing the support suit of this appeal, and my co-counsel, Stacy Villalobos. I'd also like to note that my client, who recently completed his first year working at CDCR, is here in the gallery today. Your Honors, neither CDCR nor the Personnel Board has given authority to any reason to disprove the decision below. The decision followed a six-day bench trial where nearly 2,000 witnesses testified. The district judge took extensive expert evidence, and he made meticulous factual findings after reviewing the means of the documentary evidence. The evaluates are now requiring all sorts of reasons to get a reversal, but the short answer is that there's nothing more malignant or erroneous about what the district court here did. Let me address a few of the points that Mr. Neri may need to begin with. I believe that he is a citizen of Florida, so we're actually never raised in the legal world on this appeal. He also, I think most frankly, I'm sorry, to the point of saying that the district court is having some sort of suspicion about Mr. Guerrero, which I hardly need to keep farther and further from the case. I quote from the district judge's findings in the fact that he was in Florida with an NER of 31, and the disorder does not find anything in the record that would indicate that Mr. Guerrero embodied an unqualified or either less qualified applicant. He was the person in the U.N. gallery that the district court wanted to respond to, and I think that Mr. Neri's data type, which I don't believe were at all substantiated in the record. Let me turn to the civil arguments for a little bit. As you see here in the text, the first page of our argument was that the district court somehow acted in conjugation of the Supreme Court's in the Guerrero v. Till case, which held that you could not look to bottom line workforce statistics in a case where there was going to be a step hiring process. The C.C.R. has pointed again and again, typical of the same nine people I've found in 2000, so that's not proper comparison. The Till court was concerned not about the impact on the groups, the faceless groups, but on the impact of unfair hiring procedures on individuals. And so what Till did, of course, was to say if there are people who can be identified as having been harmed at a discreet and possible stage of the homeless dispute hiring process, that device needs to be looked for, for example, so that... And that's exactly what Judge Allison found here. In fact, it goes back to Episode 3. If the only four out of the nine demographics had been with... If the reasons for those four persons with homes was...but for a reason, was there yes answers to question 75, both answers had occurred, if there was an adverse impact to the practice, which was C.C.R.'s allowing yes answers to question 75 to be used, as Judge Allison said, as a showstopper in their cases. C.C.R. again reprises its argument that from this case to the case, this 97 case to all, it's really a case on immigration status. Of course, in general, something doesn't have to do with immigration status, but again, that's the right hearing. As we've already argued, the fact that immigration status may or may not correlate with marital origin does not make our case any less of a marital origin case. What was found here was that the practice of allowing 75 yes answers to be used as showstoppers and an adverse impact on Latinos because of their marriage, of course, that's all in the total self-inquiry. The argument that somehow, for me, large claims of C.C.R.'s dissemination of the Nicaraguan process is simply overbearing. Let me talk a little bit about C.C.R.'s argument that the judge found a rational basis to the practice alleged here. That's within this characterization that the judge said in disclosing the article of intention. So that question 75 itself was not a permissible question that the inquiry about prior use of a Social Security member had a rational basis. That was not the same question analyzed in the Title VII manner of the U.S. and does the case close to 75 as a showstopper in cases where people would answer yes and an adverse impact on Latinos if you found that it did so. Can I just ask a question about that? There were 14 Latina applicants who answered yes to question 75, but they, it was not a showstopper. As to them, they went on. What's the C.C.R.'s category from the other category? Well, we're not alleging that it was a showstopper for everybody. We're reportedly alleging, and the evidence shows, that it was a showstopper for Mr. Guerrero and for a case form that's resenting an applicant. And the judge also found that there were at least four, so for the remaining seven, it was but for a cause and there were people found. The fact that some Latinos may have exerted the process doesn't mean that the item that we're challenging is a selection process that doesn't have an adverse impact off of that particular group. In practice, you have to impact 100% of the members of that particular group in order to be a problem with a counter-judge. So that gives them an understanding that there's a solution in front of you. Let me also address the argument that judges cannot find any less discriminatory alternative to question 75. That's three of another sort of misleading argument because the judge didn't have to reach the issue because the judge found that CSR had presented no evidence at all to support this business of cease and desist. The judge did, in a remedies proceeding, a decline to the border, a certain less discriminatory alternative that would be claimed for less discriminatory, but the judge had no find data from there, and the judge's liability finding in the 2007 matter for a choice was just undisputed. Let me turn now to a little summary that the Personnel Board has made. The Personnel Board is characterizing itself as really just an appellate agency allowing themselves, in fact, to court when it really is failing to acknowledge and address the fact that it has a very peculiar control over the state's services, even into the state constitution, and that control is even more pronounced in the cases of the SCAR, where Leo Concessions, his team 301, gives the Personal Board the specific authority to approve or reject CSR's personnel practices, in particular. So for a CSR, for a Personnel Board to say, gee, all you did was initiate an appeal here, it's incorrect. It supports the volumes that OMRI and OMERS are instructed, because in those cases, like here, and I recently talked about OMRI, in that case, like here, it had what this court found to be a peculiar control over OMRI practices, of the entities involved. So it was as if HCP, as a liability, was due to the cause that they decided to appeal indirectly, and it's liability was also the cause that it was indirectly going to cause the sort of peculiar systematic control that you had over MCSR. How do you argue, or should we tell you a theory, in terms of a disparate impact case? I mean, I understand your theory on a discriminatory treatment case, but this is a great impact case. What do you mean with respect to the Personal Board? Well, the Personal Board did exactly what a CSR did here, CSR included a practice we had in there, there was a plan to approve those genomes. The Personal Board was liable because it ratified and affirmed what CSR had done, when it had the responsibility and duty to do otherwise. It should have seen that MCSR did not receive an individualized assessment in its case. That would have been apparent from the papers that they conducted, a review process of the subject that they should have conducted. If they did not, they also should have. So, as I think the SPP pointed out, the group in the disappeal made a reference to discrimination, but he didn't articulate a disparate impact case in the disappeal. Why did the SPP not notice that there was something they needed to look into that was bigger than just the individual appeal? Your Honor, Mr. Groh is one person and he does not have enough restraining that would enable him to sort of say, this is the average income that you can take action under Title VII. In our briefs, we assign it to the abundant authority that provides that when you're dealing with laypersons or proceed plaintiffs, the courts will be much less exaggerating about what's required. And in this case, Mr. Guerrero did say he believed he had been the victim of discrimination. That alone should have been enough to tip off the personality that wants to do the best with the general nature of what he was complaining about. That in conjunction with his narrative of the appearance of disappeal and the documents that submitted in support of his appeal were more than enough to point out that there was a discrimination issue. And in light of that, Mr. Guerrero said, and this is very displaying for a senator, I believe that I'm the victim of some form of discrimination because I am not a native born citizen but a nationalized citizen. And the question is very close to the question here, which is, is there something about the fact that I didn't have my home state security number tied to what happened here and what was the reason for that? So, I would submit that there's an issue in which the citizen is supposedly trained to make transactions of discrimination. We've sort of seen that in, like, there's a case law in which any case is essentially you're arguing that we impose a so-to-spot activity on the agency to investigate based on any appeal, right? The race discrimination. There was a court hearing in which they began to, oh, yes, that's, that's a court case, isn't it? Well, if I'm understanding your question correctly, I mean, I understand your indirect employment theory, but essentially what happened here was simply a judiciary, right? It was a judiciary, but they failed to perform a duty that purebounds by law and under the Constitution, which is to find the subject of the first CCR for any incident in the hall of an individual's, as in the case of Guerrero. That is something that they should have learned up here, but I don't think that's anything out of their left fortune to do. What we're arguing here is that because of their peculiar control of the state's law services and with respect to CCR's practices as well, it then became an indirect employer. I don't know what I'm addressing here. I'm just... I'm assuming you're answering, yeah, I just don't understand. I mean, I think you said if you have a supervisory responsibility in an agency where you can actually reach out and change personnel's decisions, I can understand that, but that's not what happened here. What happened here was an adjudication. But there is evidence in the record that in the case of the CDCR, I'm sorry, the personnel board has very similar vehicles to the one that was involved for other reasons. For instance, that CDCR would tell them because they failed to register and they tried to look for the engagement of 500% in your specialty trackings. There's evidence in the record that shows that after the personnel board refers to the CDCR, the CDCR did not do those things again. So adjudication of those cases was solved in that exchange in the CDCR policy. I'm not quarreling with you on that, but what's your best case that Title VII liability arises from that? Well, again, because this case, just like the voting case, where because of the peculiar clearing control that the personnel board has over it as a CDCR, and because it ratified a discriminatory act, and in fact, in its own discriminatory act, on top of CDCR's, there's two layers here, its act, not CDCR's, when there's the personnel board liability. The project reserves some time for me to grow and I just want to thank you. Thank you. Thank you. Good morning. Your Honor, this is Richard Crowe for the appellate, Mr. Guerrero, and I'm here to address the attorney fee issues that Mr. Guerrero alluded to, and I'll take them in the order he raised them. It's not necessarily the order of importance, but first, CDCR complains that there was an inadequate explanation of why the court chose a 15% reduction rather than some other reduction, a higher reduction, and I think that argument is flawed, procedurally, factually, legally, procedurally, it was never raised in their objections to the special master's report when the district court would have had an opportunity to correct it. Factually, it's absolutely wrong that the district court's special master's report devoted nine pages to this issue determining the percentage this court has held. In several cases, it's not a mathematical kind of calculation like a padding average or an interest rate. It's something that the court must assess somewhat subjectively taking into account the whole wide range of factors and that's exactly what the special master did here and what Judge Alsop affirmed. In fact, what the law requires is simply that the district court show that it carefully considered the relationship between the success obtained and the fees and the special master's report did that precisely. In fact, let me quote from page 71 of the excerpt of the record where the special master's report which the judge adopted says it landed on a 15% reduction because plaintiff achieved better overall success on his court. Title VII claim in the Farino province plaintiff's case said the special master was cited without ever seeking millions of dollars in damages or over plaintiff could make hold equitable relief but not brought systemic reforms to the court. Title VII disparate impact claim that his counsel relayed society spent much time and energy to advance with the limit of fact discovery and success versus justifying a trial that is as careful a consideration of the relationship between success and the fees as could be expected. When we move to the substance of the argument the first the other objection is the CDCR makes is that there's kind of absence of proportionality between the relief achieved and the fees but no principle I think under attorneys to the law has been more consistently reaffirmed than the principle that there is no rule of proportionality between the fees and the remedy of civil rights violations those cases recognize that civil rights cases often don't involve large damages but do involve an incredible amount of work to establish and that's what happened here this was no cookie cutter case no easy case there were five motions to dismiss six summary judgment motions multiple experts in trial all of these factors were necessary to ensure that there was individual claim and by choosing only a 15% reduction the district court recognized that and last this matter of law there is no case from this circuit we're not confined for any other circuit that took a reduction as significant as 15% which in this case amounted to about 400 hours of time and a couple hundred thousand dollars took a reduction that significant and said as a matter of law it was inadequate and there had to be a higher one there are on the other hand cases from this circuit that express the accrue of reductions similar to the one here and I point specifically to two cases the Mianese versus GPS case        and I call for your recognition of this case and I will be in recess for four minutes .
judges: Thomas, Wardlaw, Morris